## MINERVA ENTERPRISES, INC. *v.* BITUMINOUS CASUALTY CORP.

92-899                                        851 S.W.2d 403

Supreme Court of Arkansas
Opinion delivered February 22, 1993

*John I. Purtle, P.A.*, for appellant.

*Anderson & Kilpatrick*, by: *Frances E. Scroggins*, for appellee.

STEELE HAYS, Justice. Minerva Enterprises, appellant, owns

a mobile home park. Minerva's lease agreement with its tenants provides for a septic system on the property to be maintained by Minerva. One of the tenants was away for several days and returned to find her mobile home flooded with solid and liquid sewage. The tenant filed suit against Minerva claiming it had failed to exercise ordinary care in maintaining the septic system. The tenant was awarded a judgment against Minerva and on appeal to this court the judgment was affirmed and the judgment was satisfied by Minerva. *Minerva Enterprises, Inc.* v. *Howlett*, 308 Ark. 291, 824 S.W.2d 377 (1992).

Minerva carried a commercial liability insurance policy with Bituminous Casualty Corporation, appellee, and requested that Bituminous defend under its policy of insurance. Bituminous refused to defend or to indemnify based on a pollution exclusion endorsement contained in the policy.

Minerva filed a declaratory judgment action against Bituminous for its failure to defend. The trial court granted summary judgment in favor of Bituminous and Minerva brings this appeal.

Minerva's general liability policy with Bituminous contained an exclusion for damage from pollutants. On that basis the trial court granted summary judgment for Bituminous, as stated in a letter opinion:

> Furthermore, the policy excludes 'waste.' Raw sewage, liquid or solid is 'waste.' Reasonable people cannot debate these points. Therefore, there are no genuine issues of material fact.

On appeal, the disagreement between the parties concerning the insurance policy centers on the interpretation of the word "pollutants" as it is used in the policy exclusion. The exclusion is embodied in a special endorsement to replace the original pollution exclusion in the policy. The endorsement reads:

## POLLUTION EXCLUSION

It is agreed that the exclusion relating to the actual, alleged or threatened discharge, dispersal, release or escape of pollutants is replaced by the following:

(1) Bodily injury or property damage arising out of

the actual, alleged or threatened discharge, dispersal, release or escape of pollutants.

(2) Any loss, cost or expense arising out of any governmental direction or request that the named insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

Subparagraph (1) above does not apply to bodily injury or property damage caused by heat, smoke or fumes from a hostile fire. As used in this exclusion, a hostile fire means one which becomes uncontrollable, or breaks out from where it was intended to be.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

■ Minerva makes two arguments. We find no merit in the first, which points to a definition of "waste" appearing in a separate endorsement which excludes coverage for nuclear material. This definition has no connection with the separate endorsement for pollutants, and the definition section of the nuclear material endorsement states specifically that the definitions apply to language "as used in this endorsement."

The second argument is that the definition of "pollutants" in the policy was intended to exclude industrial wastes, not common household wastes, and at best, the definition is ambiguous. We agree.

The pollution exclusion is a recent innovation of the insurance industry that has spawned considerable litigation. Among the cases we find a group that deals with the definition of pollution. This line of cases supports the premise that the exclusion is intended to prevent persistent polluters from getting insurance coverage for general polluting activities, whether the insured or a third party, and was never intended to cover those who are not active polluters but had merely caused isolated damage by something that could otherwise be classified as a "contaminant" or "waste."

The leading case in this group is *Molten, Allen and Williams, Inc.* v. *St. Paul Fire and Marine Insurance Co.*, 347 So.2d 95 (Ala. 1977), where a land developer of a subdivision was sued by adjacent landowners for negligently causing sand and dirt to pass from the subdivision onto their property. The developer filed a third party complaint against its public liability insurer and the insurer defended on the basis of a pollution exclusion clause similar to the one before us:

> [This policy does not] apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water. . .[but this endorsement doesn't apply if the occurrence is sudden or accidental.]

The developer argued the exclusion only contemplated the discharge of industrial refuse into the environment and a reading of the exclusion as a whole, makes clear these exclusions were not intended to cover the unintentional washing of sand from rainfall into the plaintiffs' lake. The developer also relied on the rule of *ejusdem generis*, that the specific examples following the general words, "irritants, contaminants or pollutants," were of the industrial pollutant type. The appellate court agreed:

> As noted [by appellant] the pollution exclusion clauses here, strictly construed, were intended to cover only industrial pollution and contamination. We agree with that position. We do not believe that the insured real estate developer, by a reading of the exclusion clause would reasonably expect that the alleged damage caused by its construction activity would be included in the descriptions set out in the "pollution exclusion" clause. *In other words, while a liberal construction of the "pollution exclusion" clause would not include the damage allegedly caused by [appellant], the clause is not free of ambiguity. It is believed that the intent of the "pollution exclusion" clause was to eliminate coverage for damages arising out of pollution or contamination by industry-related activities. The use of specific industry-related irritants, con-*

*taminants and pollutants seem to indicate this was the reason for the exclusion. We judicially know that during the last decade, much emphasis has been placed upon protecting the environment. The pollution exclusion was no doubt designed to decrease the risk where an insured was putting smoke, vapors, soot, fumes, acids, alkalis, toxic chemical, liquids or gases, waste materials or other irritants, contaminants or pollutants into the environment. In any event, the clause here is ambiguous.* [Our emphasis.]

The reasoning and holding of the Alabama court in *Molton, supra,* have been followed by most courts which have considered the problem. *A-1 Sandblasting & Steamcleaning* v. *Baiden,* 53 Or. App. 890, 632 P.2d 1377 (1981). (When spray painting a bridge, passing cars were hit by some of the paint. The court found that paint under these circumstances was not intended to be within the exclusion); *Pepper Industries, Inc.* v. *Home Insurance Co.,* 67 Cal. App. 3d 1012, 134 Cal. Rptr. 904 (1977) (Plaintiff discharged gasoline into a city water system and a fire and explosion resulted causing damage to the system. Court held that fair reading of the exclusion did not include this type of damage).

In *Grinnell Mutual Reinsurance Co.* v. *Wasmuth,* 432 N.W.2d 495 (Minn. App. 1988), the court held the pollution exclusion did not apply to damage to a home caused by formaldehyde emitted from deteriorating insulation. "The ordinary reader of the exclusion would reasonably conclude that it would not limit coverage for respondents' unexpected damage due to installation of building material in a home, but would exclude pervasive environmental pollution problems such as hazardous waste dumping." The court also surveyed appellate decisions of other jurisdictions where the exclusion provision was held to apply. Without exception, it found elements in those cases, which included, e.g., wide-spread pollution, deliberate disposition of potentially hazardous waste or produced substances, none of which were present in the case before it.

The list includes recent cases. In *Thompson* v. *Temple,* 580 So.2d 1133 (La. Ct. App. 1991) tenants were overcome by carbon monoxide which leaked from a bathroom heater. The court held

the pollution exclusion did not apply: "Pollution exclusion clauses are intended to exclude coverage for active industrial polluters, when businesses knowingly emitted pollutants over extended periods of time." (Cites omitted.) And in *Westchester Fire Ins. Co.* v. *City of Pittsburgh, Kan.*, 768 F.Supp. 1463 (D. Kan. 1991) the city's spraying of malathion to control insects which resulted in some personal injury actions, was held not to be within the pollution exclusion. The court found the exclusion was intended to limit liability for environmental damage. The court elaborated, giving examples of suits that would occur if the exclusion were given an expansive reading:

> If a child at a city pool complains about the chlorine in his or her eyes, the causative factor is a chemical but the city has not polluted the environment. If a fire hydrant sprays water on a passerby, that water may be an "irritant" to the person, but again the municipality responsible for the fire hydrant has not polluted the environment. If a city resident complains that the exhaust fumes from a city vehicle caused him or her breathing difficulty, the injury may be real but the city has not engaged in pollution.

*See also Continental Casualty* v. *Rapid-American*, 581 N.Y.S.2d 669 (App. Div. 1992) (Court found that asbestos dust and fibers were not a pollutant within the exclusion; *West American Ins. Co.* v. *Tufco Flooring*, 409 S.E.2d 692 (N.C. App. 1991) (Court held that fumes from company's flooring work that permeated food, were not a pollutant of the type intended to be excluded in the policy); *Broadwell Realty* v. *Fidelity & Casualty*, 528 A.2d 76 (N.J. Super. App. Div. 1987) ("The exclusion was designed to decrease claims for losses caused by pollution by providing an incentive to industry to improve its manufacturing and disposal processes").

A case almost identical to the one before us is *U.S. Fidelity & Guaranty Co.* v. *Armstrong*, 479 So.2d 1164 (Ala. 1985), where a pollution exclusion clause was invoked by the insurer. The City of Samson, Alabama, had hired a construction company to replace some existing sewer lines and during the construction raw sewage flowed onto adjacent land. Ms. Armstrong filed suit against the construction company which prompted a declaratory judgment action against the insurance carrier. The Alabama court, relying

on its earlier decision in *Molton, supra*, found the exclusion (which included "waste") should be strictly construed and was not free of ambiguity. Moreover, the court held this type of clause was intended to cover only industrial pollution and contamination.

■■ We are persuaded by these cases and their rationale and find the pollution exclusion in the case before us is, at least, ambiguous. It is not clear from the language of the policy that the single back-up of a septic tank in a mobile home park is necessarily the kind of damage the clause was intended to exclude. We find appellant's interpretation that it was intended for industrial polluters to be a plausible one. Further, while the word "waste" is used as one of the examples of pollutants in the policy definition, as mentioned in *Molton, supra*, under the rule of *ejusdem generis*, the term "waste" must be considered within the context of the entire list, all of which are pollutants related to industrial waste.

■ We hold there was an unresolved disputed issue of fact. *See Tillotson* v. *Farmers Insurance Co.*, 276 Ark. 450, 637 S.W.2d 541 (1982). The initial determination of the existence of an ambiguity rests with the court, and if ambiguity exists, then parol evidence is admissible and the meaning of the ambiguous terms becomes a question for the fact finder. *Pizza Hut of America Inc.* v. *West General Insurance Co.*, 36 Ark. App. 16, 816 S.W.2d 638 (1991).

The case is reversed and remanded for findings consistent with this opinion.

CORBIN, J., dissents.

DONALD L. CORBIN, Justice, dissenting.

I dissent.

The top page of the insurance policy contains this sentence in *bold* letters:

## THIS POLICY DOES NOT PROVIDE POLLUTION LIABILITY COVERAGE

The policy contained the following endorsement.

### *Pollution Exclusion*

It is agreed that the exclusion relating to the actual, alleged, or threatened discharge, dispersal, release, or escape of pollutants is replaced by the following:

(1) Bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants.

. . . .

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned, or reclaimed.

To me, the language of the pollution exclusion endorsement is clear and unambiguous. After stating that coverage for damage caused by pollutants is excluded, the pollution exclusion endorsement then enumerates a number of categories of substances which are classified as pollutants. The pollution exclusion endorsement states that pollutants means "*any* solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials to be recycled, reconditioned, or reclaimed."

The policy uses the word "*any*" before enumerating the categories of types of substances which are pollutants. The word "any" denotes that the terms are not all inclusive and that the terms should not be restricted in their meaning. The policy then lists "waste" as any type of substance excluded as a pollutant under the policy. The endorsement states that "waste includes materials which are to be recycled, reconditioned or reclaimed." The policy, therefore, does not restrict the meaning of the term "waste" in the pollution exclusion endorsement. As the trial court noted, sewage can be and is recycled at waste treatment facilities on a regular basis.

The policy does contain a separate nuclear energy liability

exclusion endorsement which is self limiting by its own terms. The endorsement reads:

### NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

2. As used in *this* endorsement:

. . . .

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility." [Emphasis added.]

The language of the nuclear energy liability endorsement limits the application of the term "waste" as that language is used in the endorsement solely to the nuclear energy liability endorsement. The language of that endorsement should not be applicable to other endorsements contained in the policy. This is evident by use of the words "as used in *this* endorsement." (Emphasis added.)

This reading of the language of the nuclear energy liability exclusion endorsement is not in conflict with the language used in the pollution exclusion endorsement and does not create any ambiguity. The pollution exclusion endorsement simply reads that "waste *includes* any materials which are to be recycled, reclaimed or reconditioned." Certain equipment and materials referred to in the definition of waste in the nuclear energy liability endorsement can be recycled, reconditioned, or reclaimed.

I agree with the trial judge's findings of fact and conclusions of law wherein he stated:

In the case at bar, the policy expressly excludes pollutants such as liquid and solid contaminants. *It is undisputed that the underlying Complaint of Howlett involved liquid and solid sewage which by any stretch of the word is classified as a contaminant. This undisputed fact, in itself, excludes Bituminous from defending Plaintiff.* Furthermore, the

policy excludes waste. Raw sewage, liquid or solid, is "waste." Reasonable people cannot debate these points. [Emphasis added.]

Some 30 years ago, we said in *American Homestead Ins. Co. v. Denny*, 238 Ark. 749, 384 S.W.2d 492 (1964) that the court must construe the language used by the parties in the contract of insurance in a "common sense" manner by considering the meanings of terms used as they are taken and understood in their plain, ordinary and popular sense. Any reasonable and common sense interpretation of the word "sewage" would classify sewage as a "contaminant." Since sewage is a "contaminant," any property damage arising from actual or alleged release or discharge of sewage is excluded under the terms of the policy.

The trial court properly granted the judgment in favor of appellee and the judgment of the trial court should have been affirmed.